UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

-----------------------------------------------------------------

**GARDEN CITY BOXING CLUB, INC.,** is a
**California corporation with its principal place
of business located at 2380 So. Bascom Avenue,
Suite 200, Campbell, CA 95008.,** as Broadcast
Licensee of the **June 8, 2002 Lewis/Tyson** program,

Plaintiff,

-against-

RAHEB ABDUL-KHALEK, Individually, and as
an officer, director, shareholder and/or principal of
A.K. FOODS, INC. d/b/a OLLIE'S TROLLEY
RESTAURANT a/k/a OLLIE'S & CLICKS a/k/a
CLICKS, and A.K. FOODS, INC. d/b/a OLLIE'S
TROLLEY RESTAURANT a/k/a OLLIE'S &
CLICKS a/k/a CLICKS;

Defendants.

-----------------------------------------------------------------

**PLAINTIFF'S AFFIDAVIT**
Civil Case No. 1-05-CV-1077-RCL
Honorable Royce C. Lamberth

STATE OF CALIFORNIA    }
                   }ss.:
COUNTY OF SANTA CLARA}

JOSEPH GAGLIARDI, being duly sworn, deposes and states the following:

1.     I am President of Plaintiff, Garden City Boxing Club, Inc., and, as such, am fully familiar with the facts, circumstances and proceedings heretofore had herein.

2.     I make this Affidavit in support of Plaintiff's request to recover statutory damages, including filing fees, service of process fees, investigative costs and interest in the within request for judgment by default.

3.     Plaintiff, Garden City Boxing Club, Inc., owns the rights for the commercial distribution of the Lewis/Tyson fight which was held on June 8, 2002. The licensing agreement is attached hereto as Exhibit "A." My company thereafter marketed the sub-licensing of the

broadcast to commercial establishments in the State of New York for a fee.

4.    Prior to the Tyson/Lewis broadcast, Garden City Boxing Club, Inc., hired Signal Piracy, Inc. to contract with independent auditors who were assigned to identify establishments that unlawfully exhibited our program. Signal Piracy, Inc. charged a fee as set forth in their invoice.

5.    To insure that only illegal locations were visited by the auditors, a list of authorized and legal locations who paid the required fee to broadcast the Tyson/ Lewis fight which was held on June 8, 2002, was distributed to Signal Piracy, Inc., who provided same to all of their contracting auditors prior to visiting any unauthorized locations on June 8, 2002. This list is attached hereto as Exhibit "B"

6.    According to our files, Rasheed Moss, one of the independent auditors, visited Defendant's establishment, Clicks, at approximately 11:52 p.m. on June 8, 2002. He entered paying a $10.00 cover charge and observed two television sets exhibiting a portion of the Tyson/Lewis program to thirteen patrons in an establishment with a capacity of sixty. The auditor's affidavit attesting to these facts is attached as Exhibit "C"

7.    Signal Piracy was paid the sum of $350.00 from my company for the investigative work preformed in identifying Click's and its owners as a pirate of the Tyson/Lewis event. Their invoice is attached as Exhibit "D".

8.    It is essential that I communicate to the Court that to the best of my knowledge this programming is not and cannot be "mistakenly or innocently intercepted." Some methods that a signal pirate can unlawfully intercept and broadcast such program illegally are as follows without limitation:

1.    The use of a "blackbox" which is purchased for a fee and when installed on a cable TV line will allow for the descrambled reception of a pay-per-view broadcast, or

2.    The purposeful misrepresentation of a commercial establishment as a residential property would allow the purchase of a pay-per-view broadcast for the event at the residential price of $54.95, or

3.    The use of a illegal cable drop or splice from an apartment or home adjacent to the commercial establishment premises who would purchase the broadcast at a residential price and divert the program to the commercial establishment and/or

4.    The same initial actions being employed with respect to a "DSS Satellite Systems" or a "C-Band Satellite System."

These forms of satellite theft also involve the misrepresentation of a residential location, purchase of illegal unincryption devices, and/or the purchase of illegal satellite authorization codes which are readily available on the Internet and in various publications which are presently unregulated in the Nation of Canada.

9.    To explain the history of Plaintiff's claim, your deponent submits that shortly after the advent of Pay-Per-View broadcasts, of which our company stands at the forefront, we began to experience a serious erosion of the sales to commercial establishments throughout the United States of America.    Thereafter, we endeavored to find out what was the basis for the erosion.    Much to our disappointment, we discovered that the root cause of the erosion of our customer base was the piracy of our broadcasts by unauthorized and unlicensed establishments.

10.    In response, we embarked upon a program which was designed to identify and prosecute the commercial establishments which stole our broadcasts.

11.    Turning these facts to the matter before the Court, I have been advised by counsel that the Court has the discretion in the awarding of damages for these nefarious and illegal activities.

12.    It is respectfully submitted to this honorable Court that the unchecked activity of signal piracy not only has resulted in my business being severely damaged, but also has a negative effect upon lawful residential and commercial customers of cable and satellite broadcasting whose costs are necessarily increased significantly by these illegal activities.

13.    I believe that such acts of piracy have cost my company millions of dollars in the last few years, while at the same time causing a reduction in our lawful business resulting from the perceived lack of consequence for such unlawful interception.

14.    I, therefore, humbly ask this Court to grant the maximum allowance for statutory damages due to the fact that such actions are *per se* intentional and do not and cannot occur without the willful and intentional modification of electronic equipment, the business misrepresentation of a commercial establishment as residential, or, the removal of cable traps and/or devices designed to prevent such unauthorized exhibits.

**WHEREFORE,** your deponent respectfully requests that this Court in its discretion grant judgment by default under 605(a) on COUNT I of the Plaintiff's complaint against the Defendants jointly and severally as follows:

**Against RAHEB ABDUL-KHALEK, Individually**

1)    under 605(e)(3)(C)(i)(II) in the sum of up to TEN THOUSAND DOLLARS ($10,000.00)

2)    and under 605(e)(3)(C)(ii) a sum of up to ONE HUNDRED THOUSAND DOLLARS ($100,000.00) for enhanced damages for Defendant's willful violation of 605(a)

3)    and under 605(e)(3)(B)(iii) investigative fees of $350.00 plus costs and Attorney

fees as set forth in the Attorney Affirmation of Costs and Fees.

**A.K. FOODS, INC. d/b/a OLLIE'S TROLLEY RESTAURANT a/k/a OLLIE'S & CLICKS a/k/a CLICKS**

1) under 605(e)(3)(C)(i)(II) in the sum of <u>up to</u> TEN THOUSAND DOLLARS ($10,000.00)

2) and under 605(e)(3)(C)(ii) a sum of <u>up to</u> ONE HUNDRED THOUSAND DOLLARS ($100,000.00) for increased damages for Defendant's willful violation of 605(a)

3) and under 605(e)(3)(B)(iii) investigative fees of $350.00 plus costs and Attorney fees as set forth in the Attorney Affirmation of Costs and Fees.

and a permanent injunction restraining the Defendants from violating 605(a).

Dated: September 20, 2005

JOSEPH GAGLIARDI,
President, Garden City Boxing Club, Inc.

Sworn to before me on this _20_ day
Of September   , 2005.



Notary Public- State of California

SHARON CUNNINGHAM
COMM. #1440152
Notary Public-California
SANTA CLARA COUNTY
My Comm. Exp. Sept 19, 2007

Exhibit A

EXECUTION COPY

## CLOSED-CIRCUIT
## LICENSE AGREEMENT

This agreement (the "Agreement") is entered into as of April 25, 2002 by and between Home Box Office, a division of Time Warner Entertainment Company, L.P. ("HBO") and Showtime Networks Inc. ("SNI") (collectively, "Licensor") on the one hand and Garden City Boxing Club, Inc. ("Licensee") on the other, and sets forth the terms and conditions concerning the conveyance by Licensor to Licensee of the closed-circuit distribution rights in the "Territory" (as defined below) to the upcoming boxing bout featuring Lennox Lewis ("Lewis") versus Mike Tyson ("Tyson"), along with the accompanying undercard bouts (collectively, the "Event").

1.    **Grant of Rights.**

(a)    Licensor hereby grants to Licensee the exclusive (except as provided in subparagraphs 5(e) and 5(f) below) right and license to market, exhibit and sell the Event solely on a "Closed-Circuit" (as defined below) basis in the "Territory" (as defined below) at the same time as the pay-per-view exhibition of the Event (which is scheduled to occur on June 8, 2002 beginning at approximately 9:00 p.m. (ET)), in accordance with the provisions set forth in this Agreement.

(b)    For purposes of this Agreement, the following terms shall have the following meanings:

(i)    "Territory" shall mean (x) the United States and its territories and possessions (including, but not limited to, Puerto Rico, Saipan and Guam), but excluding Memphis, Tennessee and the 20 mile radius therefrom, Tunica, Mississippi and the 20 mile radius therefrom and all of Clark County, Las Vegas, Nevada (with the exception of the City of Laughlin, Nevada and a 10 mile radius therefrom, which shall be included in the Territory), (y) Canada, and (z) those areas of the Caribbean set forth on Exhibit A attached hereto.

(ii)    "Closed-Circuit" shall mean the televised exhibition of the Event in "Closed Circuit Locations" (as defined below).

(iii)    "Closed—Circuit Locations" shall mean theaters, arenas, casinos, auditoriums, bars, restaurants or other similar locations of public assembly where an admission fee or other consideration is charged and received, but in no event with a fire code capacity in excess of 500 persons, except for licensed gambling casinos located within the Territory, which shall be permitted to have a fire code capacity not to exceed 1,000 persons. In no event shall any single Closed-Circuit Location establish more than one location within such establishment or its environs to exhibit the Event.

(iv)   "Permitted Closed-Circuit Locations" shall mean a Closed-Circuit Location located within the Territory licensed by Licensee or Licensee's sublicensee on terms and conditions consistent with this Agreement to market, exhibit and sell the Event within such Closed-Circuit Location.

(c)   Licensee reserves the right to enter into one or more partnerships or other relationships (referred to herein as a "distribution partner") for purposes of marketing the exhibition and sale of the Event to Closed-Circuit Locations, provided that, as a condition of entering into any such partnerships or relationships, Licensee shall cause such distribution partners to comply with all of the terms and conditions of this Agreement. Any breach by any distribution partner of any term or condition of this Agreement shall constitute a breach by Licensee of this Agreement, and shall allow Licensor to proceed directly against Licensee for such breach without any requirement that Licensor first or ever proceed directly against the pertinent distribution partner(s). Furthermore, Licensee makes no representations or warranties of any kind (express or implied) arising out of or concerning any agreement between Licensee and any distribution partner and Licensor shall have no responsibility or liability of any kind to Licensee or any distribution partner, or any other third party, arising out of or on account of any agreement between Licensee and any distribution partner.

2.   **Term**. The term of this license shall be from the date of this Agreement through and including completion of the Event (unless earlier terminated in accordance with the provisions of this Agreement) (the "Term"). The date for the Event is currently scheduled for June 8, 2002, with the televised portion of the Event scheduled to start at approximately 9:00 p.m. ET, and the location of the Event is currently to be Memphis, Tennessee.

3.   **Compensation/Accounting**.

(a)   License Fee. The license fee ("License Fee") due and payable by Licensee to Licensor on account of the Event shall be equal to (i) a minimum license fee of                              ("Minimum License Fee") plus (ii)                    percent (    %) of "Gross Revenues" (as defined below) in excess of                  . Licensee shall remit to Licensor such                    Minimum License Fee payment by letter of credit payable to HBO on behalf of HBO and SNI. Licensee shall cause a commercial bank acceptable to Licensor to issue in favor of HBO a letter of credit in the amount of                        and shall furnish HBO the original (and SNI a copy) of such letter of credit by no later than Monday, May 6, 2002. Licensor shall have the right to designate an advising bank and to pre-approve the wording of the letter of credit. Such letter of credit may be drawn by Licensor in full on the first business day following the Event upon presentation to the issuing bank of the original letter of credit and a newspaper article indicating that the bout between Lewis and Tyson has occurred (regardless of the outcome of such bout).

- 2 -

For purposes of this Agreement, "Gross Revenues" shall mean (i) any and all license fees and other consideration received by, credited to the account of, payable or due to, or earned by, Licensee and Licensee's distribution partners from any and all sources whatsoever in connection with the exploitation of the Closed-Circuit rights to the Event, in any form of consideration whatsoever, including but not limited to, barter or trade (valued at the fair market value), advances, guarantees, fees, minimum payments or lump sum payments, without deduction of any kind, plus (ii) any and all amounts received by, credited to the account of, payable or due to, or earned by, Licensee and/or Licensee's distribution partners on account of any award or settlement (net of reasonable attorneys' fees, disbursements and court costs) on account of any claim regarding a breach of contract by a Permitted Closed-Circuit Location or on account of Piracy by any Closed-Circuit Location or other person or entity as contemplated by Section 5(d) below, minus only (iii) legitimate taxes imposed on Licensee's or a Permitted Closed-Circuit Location's exhibition of the Event collected by Licensee and actually paid over to the applicable governmental taxing authority(ies) (but not including any income, franchise or similar taxes).

(b)   Collection/Reporting/Accounting.   Licensee shall be responsible for the collection of all Gross Revenues, and shall remit any amounts due to Licensor, not later than twenty (20) business days after the date of the live Event.   In that regard, Licensee shall provide the following reports to Licensor, no later than twenty (20) business days after the date of the live Event (and on a quarterly basis thereafter): (i) the identity of each Permitted Closed-Circuit Location together with the fire code capacity of each such Permitted Closed-Circuit Location (except where such fire code capacity is not reasonably available, Licensee shall provide a reasonable estimate of such fire code capacity); (ii) a summary of the payment terms for each such Permitted Closed-Circuit Location; (iii) the license fees and other consideration received and to be received on account of each such Permitted Closed-Circuit Location by Licensee in connection with the Closed-Circuit exhibition of the Event; and (iv) any other information reasonably necessary or requested by Licensor in order to assist Licensor in verifying Licensee's obligations under this Agreement.

(c)   Payment Instructions.   Unless Licensor instructs Licensee in writing otherwise, all payments to be made by Licensee to Licensor (other than the letter of credit) shall be made payable to HBO and SNI and sent to Licensor at an address to be supplied to Licensee by Licensor.

(d)   Additional Reporting.   In addition to the reports referenced in subparagraph (b) above, Licensee shall provide to Licensor at least seven (7) calendar days prior to the date of the live Event and an updated report on the day of the live Event a preliminary statement detailing the name and address of each Permitted Closed-Circuit Location scheduled to receive the Event.   Licensee shall provide to Licensor at least seven (7) calendar days after the date of the live Event a statement detailing the following:

- 3 -

the name, phone number and full address (i.e., street, city, state and zip code) of each Permitted Closed-Circuit Location that was authorized to receive the Event, the seating capacity of each such Permitted Closed-Circuit Location and the license fees and other consideration received or to be received on account of each such Permitted Closed-Circuit Location by Licensee in connection with the Closed-Circuit exhibition of the Event.

(e)    Books and Records; Examinations.

(i)    Licensee shall keep and maintain, at its principal place of business, complete and accurate records and books of account in connection with the Event. Throughout the Term and for a period of three (3) years thereafter, but no more than once per year, and no more than three times altogether, Licensor (or its representatives), upon ten (10) days prior written notice to Licensee, shall have the right during normal business hours, to examine, inspect and copy Licensee's books and records pertaining or making reference to the Event and/or Gross Revenues and any and all other books, records, data, documents, and/or equipment which are reasonably necessary for the purpose of verifying and confirming the accuracy of the statements delivered to Licensor hereunder and the amount of the License Fee paid or payable to Licensor hereunder. Licensee shall cooperate fully with Licensor in all such examinations. Any information or reports obtained in the course of any examination hereunder shall be maintained by Licensor in confidence in accordance with the provisions of Paragraph 13.

(ii)    Licensee shall in its contract with each Permitted Closed-Circuit Location require each such Permitted Closed-Circuit Location to (x) keep and maintain, at each such entity's principal place of business, complete and accurate records and books of account in connection with the Event exhibited by such Permitted Closed-Circuit Location as contemplated hereunder, (y) permit Licensor (or its representatives) throughout the Term and for a period of three (3) years thereafter (but no more than once per Permitted Closed-Circuit Location), upon ten (10) days prior written notice to Licensee and the pertinent Permitted Closed-Circuit Location(s), during normal business hours, to examine, inspect and copy, each of the Permitted Closed-Circuit Locations' books and records relating to the Event for the purpose of verifying and confirming the accuracy of the statements and payments delivered to Licensee by the Permitted Closed-Circuit Location(s) in question, and the statements delivered to Licensor by Licensee and the amount of the License Fee paid or payable to Licensor hereunder, and (z) cooperate fully with Licensor in all such examinations. Any information or reports obtained in the course of any examination hereunder shall be maintained by Licensee and Licensor in confidence in accordance with the provisions of Paragraph 13.

(f)    Technical Failures. Licensor shall have no liability or responsibility to Licensee, any distribution partner of Licensee or any Closed—Circuit Location on account of any technical failure in the transmission of the Event to any given Closed-Circuit Location(s) which has the effect of preventing authorized customers in such

- 4 -

Closed-Circuit Location(s) from receiving a complete technical viewing of the Event. Licensee shall have the right to acquire, at Licensee's sole cost and expense, its own telecast failure insurance policy covering the Event.

4.    **Delivery.**  Licensee shall be solely responsible for obtaining, installing, testing, operating and maintaining any and all decoding and other reception equipment necessary in order to receive the Signal of the Event at each Permitted Closed–Circuit Location's headend or other receiving device from the Delivery Point. Licensee shall provide technical assistance prior to and during the telecast of the Event with regard to technical matters and/or failures if and as they occur. Licensee shall have the responsibility to make arrangements with DirecTV, EchoStar, TVN or another mutually agreed upon satellite provider or providers, to transmit the Event to, and electronically address and authorize, each Permitted Closed-Circuit Location's headend or other receiving device at Licensee's expense (it being understood that any agreement to provide, and all costs and expenses and charges associated with the provision of, such transmission, addressing and authorization services shall be Licensee's sole responsibility and liability). In addition, Licensee shall have the right to make arrangements with local cable television system operators within the Territory to transmit the Event to, and electronically address and authorize, each headend or other receiving device of Permitted Closed-Circuit Locations located within the operating area of such cable television system operator (it being understood that any agreement to provide, and all costs and expenses and charges associated with the provision of, such transmission, addressing and authorization services shall be Licensee's sole responsibility and liability).

5.    **Exhibition.**

(a)    All decisions with regard to the scheduling and exhibition of the Event shall be made by Licensor in its sole discretion. Licensee shall include in its contract with each Permitted Closed-Circuit Location the obligation on each such Permitted Closed-Circuit Location to exhibit the telecast of the Event only when and as delivered by Licensor in its entirety without any delays, interruptions, intermissions, cuts, deletions, alterations, modifications, additions or editing of any kind, and with all titles, credits, and copyright notices as contained in the version of the Event delivered by Licensor under this Agreement.

(b)    Except as required for the exploitation of the Event as licensed in this Agreement, Licensee shall not record, duplicate or copy the Event, or authorize or knowingly permit the recording, duplication, copying or unauthorized receipt of the Event or any portion thereof. Licensee shall not, and shall include in its contract with each Permitted Closed-Circuit Location the obligation that each such location shall not, retransmit the Event to any entity or person or do any of the things listed in the first sentence of this subparagraph (b).

- 5 -

(c)    Licensee shall employ reasonably adequate security systems sufficient to prevent the theft, pirating, copying or duplication of the Event and shall take reasonable steps to prevent any unauthorized reception, exhibition or retransmission of the Event. Licensee shall also take reasonable steps to police for any breach of the contract regarding the exhibition of the Event between Licensee and each Permitted Closed-Circuit Location, including the placing of a representative of Licensee at a reasonable number of Permitted Closed-Circuit Locations (including any location at which Licensee is responsible for administering the box office for such location) to which the Event is transmitted, and shall promptly notify Licensor of each instance of a breach of any contract regarding the exhibition of the Event between Licensee and any Permitted Closed-Circuit Location(s).

(d)    In the event Licensee has knowledge, or has been notified (by Licensor or otherwise), of the occurrence of any theft, pirating or unauthorized reception, exhibition, use or transmission of the Event by or occurring within any Closed-Circuit Location (referred to herein for convenience collectively as "Piracy"), Licensee shall have the exclusive right (except as set forth below) to take any action reasonably necessary to pursue available civil or criminal claims against such Closed-Circuit Location(s) based upon such occurrence of Piracy, including but not limited to commencing, compromising or settling any claims or litigation relating to such Piracy.    Solely for purposes of effectuating the intent of this subparagraph (d) (but for no other purpose), Licensee shall be deemed to have a proprietary interest in the signal of the Event to the limited extent necessary to satisfy the meaning of 47 U.S.C. §§ 605 and 553. Licensee shall promptly notify Licensor of each instance of Piracy within any location of which it has knowledge (including in such notice reasonable details concerning such Piracy). In the event Licensee has knowledge, or has been notified, of the occurrence of any breach of contract by a Permitted Closed-Circuit Location regarding the exhibition of the Event, Licensee shall promptly notify Licensor and shall, in consultation with Licensor, take any and all reasonable actions to pursue available civil or criminal claims based upon such occurrence (provided that to the extent that Licensor cooperates with any efforts by Licensee to pursue such claims, such cooperation shall be at Licensee's expense).    Notwithstanding any of the foregoing or anything else contained in this Agreement, Licensee's rights under this subparagraph 5(d) shall not include the right to take or threaten to take or the right to authorize any person or entity to take or threaten to take, any legal or other action of any kind against any entity related to or affiliated with HBO, SNI, or against any cable television system operator or satellite distributor arising out of such related or affiliated entity's, cable television system operator's or satellite distributor's distribution, transmission or authorization of the Event, such rights being reserved exclusively to Licensor hereunder.    In addition, Licensor shall have the right (for any reason or no reason) to require Licensee to discontinue any and all action or threats of action against any person(s), entity(ies) or location(s) without any liability or penalty to Licensor and, therefore, promptly upon receipt of written notice from Licensor, Licensee shall discontinue any and all action or threats of action against any person(s), entity(ies) or

- 6 -

location(s) designated in such notice. Licensee's agreements with its distribution partners shall expressly reflect the limitation on Licensee's rights contained in the foregoing three sentences. Without limiting the four immediately preceding sentences, in no event shall any party hereto pursue any claims in the other party's name without such other party's prior written consent. Notwithstanding anything to the contrary in this Agreement, any and all amounts received by, credited to the account of, payable or due to, or earned by, Licensee and/or Licensee's distribution partners on account of any award or settlement (net of reasonable attorneys' fees, disbursements and court costs) on account of any claim regarding a breach of contract by a Permitted Closed-Circuit Location or on account of Piracy by any Closed-Circuit Location or other person or entity shall be considered Gross Revenues and Licensee shall remit to Licensor within fifteen (15) business days after Licensee's receipt of such amounts Licensor's share of such amounts. For so long as Licensee is pursuing any claim of Piracy and/or breach of contract by any Closed-Circuit Location(s), Licensee shall keep Licensor informed on a regular basis (no less than quarterly) as to the status of each claim of Piracy and each claim of breach of contract by any Closed-Circuit Location, including the status of any litigation, settlement offers or arrangements or other matters that may reasonably affect Licensor or future events distributed by Licensor.

(e)    To facilitate and allow for Licensor's exhibition of the Event to certain private promotional parties sponsored by Licensor, Licensee shall authorize and transmit the Event to the respective headends or other receiving devices of location(s) that Licensor shall specify in writing at least four (4) days prior to the Event; provided that (i) each such exhibition to a private promotional party shall be free of admission charge, (ii) no promotional party shall comprise more than approximately one hundred (100) people (except that one promotional party in each of Washington, D.C. and New York City shall not be subject to such one hundred person limit), (iii) there shall be no more than thirty (30) such promotional parties, and (iv) such showings shall be by invitation only and not open for attendance by the general public.

(f)    Licensee shall black out the Event in the general area of Memphis, Tennessee and the 20 mile radius therefrom and in Tunica, Mississippi and the 20 mile radius therefrom and in all of Clark County, Las Vegas, Nevada (with the exception of the City of Laughlin, Nevada and a 10 mile radius therefrom, which area Licensee shall not be required to blackout): Licensor shall have no liability to Licensee, any distribution partner, or any Closed-Circuit Location or any customer of any Closed Circuit Location on account of such blackout. In addition, Licensee acknowledges and agrees that the local site promoter for the Event and/or other third parties shall have the right to market and sell a Closed-Circuit telecast of the Event in the blacked out locations specified above and Licensee shall have no right to any revenue, license fee or other consideration or compensation on account of such Closed-Circuit exploitation. Licensee shall authorize and transmit the Event to the respective headends or other receiving devices of location(s) contemplated in this Paragraph 5(f) that Licensor and/or the local site promoter shall

specify in writing at least four (4) days prior to the Event. Tech fees on free locations shall be billed at _____ per location and Licensee shall have no liability in the event of any unintentional failure of the signal to reach any said free location(s).

6.    **Postponement or Cancellation of the Event**.    Notwithstanding anything to the contrary in this Agreement, Licensor in its discretion, may cancel or postpone the date or time of, the Event at any time for any reason without liability or penalty to Licensee or any third party.

(a)    Postponement.    In the event of a postponement of the Event by Licensor to a later date, this Agreement shall remain in full force and effect and applicable to the rescheduled date. Notwithstanding the foregoing, if the Event is postponed for more than one hundred twenty (120) days beyond the originally scheduled date for the Event, either party shall have the right, by providing at least ten (10) days prior written notice to the other party by no later than fifteen (15) days after Licensee's receipt from Licensor of written notice of the new date for the Event (or notice that such new date has not been scheduled to occur within such 120 day period), to terminate this Agreement without liability or penalty, whereupon Licensor shall have no further obligation or liability to Licensee of any kind arising out of the Event or its postponement or any subsequent event featuring Tyson or Lewis (either together or separately) and Licensor shall be free to license any other person(s) or entity(ies) to be the Closed-Circuit distributor of such event.

(b)    Cancellation.    In the event of a cancellation of the Event by Licensor, this Agreement shall immediately terminate without further notice, whereupon Licensor shall have no further obligation or liability to Licensee of any kind arising out of the Event or its cancellation or any subsequent event featuring Tyson and/or Lewis and Licensor shall be free to license any other person(s) or entity(ies) to be the Closed-Circuit distributor of such event.

7.    **Marketing and Advertising**.

(a)    Licensee shall use its best efforts to promote the Event to all potential Permitted Closed-Circuit Locations and to maximize Closed-Circuit sales of and Gross Revenues from the Event. Licensee shall list the exhibition date and time of the Event in all guides (whether in electronic, print or other form) provided by Licensee to its customers.

(b)    In addition to other rights granted herein, Licensor hereby grants to Licensee the following rights with respect to the Event, subject to reasonable third party restrictions, if any, of which Licensee is advised at least twenty (20) days before the Event and the further restrictions enumerated in this Agreement:

- 8 -

(i)    the right to use any promotional materials delivered by Licensor to Licensee for the purpose of advertising and promoting solely to Permitted Closed-Circuit Locations the upcoming exhibition of the Event for receipt and exhibition of the Event by such Permitted Closed-Circuit Locations as contemplated in this Agreement, provided that Licensee acknowledges and agrees that Licensor has no obligation of any kind and has made no commitments of any kind to provide any promotional materials on account of the Event;

(ii)    the right to manufacture and produce its own promotional and publicity materials, provided, however, that Licensee shall submit any such materials to Licensor for its prior written approval (such approval to be granted or withheld in Licensor's sole discretion) prior to any use of such materials and shall make any and all changes or modifications to such materials reasonably requested by Licensor prior to any use of such materials; and

(iii)    subject to and without limiting Licensee's obligations in subclause (ii) above, the right to use the names, voices, images, and likenesses of the principal boxers scheduled to appear in the Event, and Licensor's name and logo in order to advertise and publicize such Event, but in no event shall the names, voices, images and/or likeness of any person or entity appearing in or connected with the Event or Licensor's name and logo, be used separate and apart from the promotion of the upcoming exhibition of such Event. No such name or likeness or logo shall be used so as to constitute an endorsement or testimonial express or implied, of any party, product, service or commercial venture (including without limitation Licensee) other than the Event. Licensee shall comply with all restrictions and other requirements regarding the use, exhibition and promotion of the Event communicated by Licensor to Licensee at least twenty (20) days before the Event, including without limitation, all contractual and/or union credit obligations. Licensee may not advertise or promote the Event or otherwise use any materials from or relating to the Event after the date of the live Event.

(c)    Each party acknowledges that the names and marks of the other are the exclusive property of such party (and/or its parent, subsidiary and/or affiliated entities) and that it has not and will not acquire any proprietary rights in any such names or marks by reason of this Agreement. Neither party shall (except as otherwise expressly permitted by this Agreement) use the names or marks of the other party hereto without the prior written consent of such party in each instance (unless such materials were obtained in their entirety from the party owning such name or mark and the proposed use is in complete conformance with the granting party's instructions relating to such use).

8.    **Reservation of Rights**.

(a)    Licensor acknowledges and agrees that the Event will be exhibited in the Territory on a pay-per-view basis and possibly via broadcast radio at the same time or

- 9 -

on the same day as the live Event and on a continuing basis thereafter in pay-per-view, premium and other media, and that Licensor shall have no liability or obligation to Licensee or any distribution partner of Licensee or any Closed-Circuit Location on account of any such exhibitions or the marketing and promotion of such exhibitions, and Licensee acknowledges and agrees that there are no restrictions or limitations on the time or extent to which, or the geographic area within which, Licensor may market, exhibit and sell, and/or license the right to others to market, exhibit and sell the Event on a pay-per-view or other basis.

(b)    Licensee acknowledges and agrees that all rights not expressly granted to it hereunder are reserved to Licensor (including it being expressly acknowledged and agreed that, without limiting anything else contained in this Agreement, Licensee shall not have the right to serve, market, advertise or promote the Event, or otherwise make the Event available, (i) to (X) any residential subscribers at any place of residence, (Y) any guest rooms in hotels or motels, or other institutions or residential properties, or (Z) to any area or establishment that is open to the general public without charge to individuals, or (ii) outside of the Territory).

9.    **Representation and Warranties and Additional Covenants.**

(a)    Licensor represents and warrants and covenants that:

(i)    it is and will remain a corporation or other legal entity duly organized, validly existing and in good standing under the laws of the state of its incorporation or other registration;

(ii)    it has the right, power and authority to enter into this Agreement and to perform all of its obligations hereunder (including the right, power, and authority to grant to Licensee all of the rights granted under this Agreement);

(iii)    Licensor is the entity which possesses, or will have acquired at the pertinent times during the Term, all Closed-Circuit rights in the Territory for the Event;

(iv)    Licensor's entering into this Agreement and the performance of all of its obligations hereunder will not violate or infringe upon any rights of any third party whatsoever (provided that Licensor makes no representations, warranties or covenants of any kind with respect to music performance licenses); and

(v)    the individual executing this Agreement on Licensor's behalf has the authority to do so.

Notwithstanding any of the foregoing or anything else contained in this Agreement,

- 10 -

Licensor makes no representations or warranties regarding music performing rights, all of which are expressly excluded (and all such music performing rights shall be the sole responsibility and liability of Licensee and/or the Permitted Closed-Circuit Locations). EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES GIVEN ABOVE, LICENSOR DISCLAIMS, AND LICENSEE HEREBY WAIVES, ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, CONCERNING THE EVENT, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. The foregoing disclaimer shall neither act as nor constitute an admission by Licensor that the Event or any part thereof constitute goods, commodities or tangible personal property under or for the purposes of any applicable law.

(b)    Licensee represents and warrants and covenants that:

(i)    it is and will remain a corporation or other legal entity duly organized, validly existing and in good standing under the laws of the state of its incorporation or other registration;

(ii)    it has the right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

(iii)    it has and will continue to have (or will have acquired at the pertinent time) all the rights and authority necessary to enter into this Agreement and to perform all of its obligations hereunder; and

(iv)    the activities of Licensee hereunder shall not violate, infringe, or conflict with any rights of any person or entity; and

(v)    the individual executing this Agreement on Licensee's behalf has the authority to do so.

10.    **Right to Cure**.  In the event that Licensor believes that Licensee has breached any provision of this Agreement, Licensor shall provide Licensee with detailed written notice thereof and Licensee shall have ten (10) days to cure said breach after its receipt of such notice. In the event that Licensee believes that Licensor has breached any term of this Agreement, Licensee shall provide Licensor with detailed written notice thereof and Licensor shall have ten (10) days to cure said breach after its receipt of such notice.

11.    **Taxes**.  Licensee hereby agrees to be solely responsible for, and to pay, without limitation, any and all taxes, assessments, levies or charges imposed, levied or assessed by any applicable statute, law, rule or regulation now in effect, or hereafter enacted (including but not limited to ticket taxes, gross receipts taxes, sales, use, property

and excise taxes or other similar taxes, howsoever denominated) on or in connection with or with respect to any and all of Licensee's exploitation of the Event within the Territory or the use of any and all materials relating thereto used or exhibited in the Territory or Licensee or any Permitted Closed-Circuit Location, or any right or privilege to use any of the same in the Territory, or any receipts, fees, charges, monies, or other sums received or payable in connection with the Closed-Circuit exhibition and/or exploitation thereof in the Territory; it being the intent hereof that, unless otherwise expressly approved by Licensor in writing, the License Fee due Licensor as the consideration for the rights granted herein shall be a net amount which shall be free and clear of any tax, levy or charge of any kind or nature, howsoever denominated, other than any income taxes on the License Fee imposed on or levied against Licensor under applicable United States law.

12. **Indemnification**. Each party (the "Indemnifying Party") shall defend and hold the other party and its subsidiary and parent and affiliated companies and their respective present and former officers, agents, directors and employees, and their respective successors, licensees, and permitted assigns (the "Indemnified Party(ies)") harmless from and against any and all claims, proceedings, actions, damages, costs, expenses and other liabilities and losses of whatsoever kind or nature incurred by any Indemnified Party (including reasonable attorneys' fees and disbursements and court costs) caused by any breach by the Indemnifying Party of any representation, material term, warranty, covenant or agreement hereunder. EXCEPT TO THE EXTENT A PARTY IS REQUIRED TO PAY SUCH DAMAGES AS PART OF A THIRD PARTY CLAIM AGAINST IT TO WHICH IT IS ENTITLED TO INDEMNITY HEREUNDER, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, ANY LOST PROFITS OR LOSS OF BUSINESS, WHETHER FORESEEABLE OR NOT), OCCASIONED BY ANY BREACH UNDER THIS AGREEMENT OR ANY OTHER CAUSE WHATSOEVER, WHETHER SUCH DAMAGES ARE ASSERTED IN AN ACTION BROUGHT IN CONTRACT, IN TORT OR PURSUANT TO SOME OTHER THEORY.

13. **Confidentiality/Publicity**. No party to this Agreement shall disclose to any third party (other than its respective employees, lawyers, directors, and officers, in their capacity as such, on a need-to-know basis, provided that such employees, lawyers, directors, and officers agree to be bound by the provisions of this Paragraph), any information with respect to the financial or other provisions of this Agreement except: (a) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event(s) the party making such disclosure shall so notify the other as promptly as practicable (if possible, prior to making such disclosure) and shall seek confidential treatment of such information, (b) to the extent necessary to comply with boxing regulatory requirements, S.E.C. or similar disclosure requirements, (c) as part of its normal reporting or review procedures to its parent and other affiliated companies, their banks, auditors and attorneys and similar professionals, provided that such companies, banks, auditors and attorneys and similar professionals agree to be bound by the

provisions of this Paragraph, and (d) in order to perfect and enforce its rights pursuant to this Agreement or any other agreement between the parties.    The parties to this Agreement shall also mutually agree on the timing and content of any press announcement(s) or other public statement(s) regarding the entering into, or any other aspect of, this Agreement, and the parties hereto agree that such mutually approved press announcement(s) or other public statement(s) shall be the only press announcement(s) or public statement(s) regarding this Agreement.

14.    **No Assignment**.  This Agreement shall redound to the benefit of and be binding on the respective successors and permitted assigns of the parties. Notwithstanding the foregoing sentence, Licensee shall neither have the right to assign in whole or in part this Agreement nor the right to delegate any duties hereunder without the prior written consent of Licensor, which may be granted or withheld in Licensor's sole discretion.    Any assignment or delegation of this Agreement by Licensee without Licensor's prior written consent shall accordingly be deemed null and void and of no force and effect.

15.    **Relationship**.  Nothing contained herein shall be deemed to create, and the parties do not intend to create, a joint venture, partnership, principal/agent relationship or other fiduciary relationship between the parties hereto, and neither party is authorized to or shall act toward third parties or the public in any manner that would indicate any such relationship with the other.

16.    **No Third Party Beneficiaries**.  The provisions of this Agreement are for the exclusive benefit of the parties who are signatories hereto and their successors and permitted assigns, and no third party (including, without limitation, any distribution partner of Licensee, Closed-Circuit Location(s), Permitted Closed-Circuit Location(s) or any viewers of or subscribers to the Event) shall be a beneficiary of, or have any rights by virtue of, this Agreement (whether or not such third party is referred to herein).  Without limiting the foregoing, Licensee hereby acknowledges that it, and not Licensor, shall be fully responsible for all claims and matters with any Permitted Closed-Circuit Locations or other Closed-Circuit Locations, or any viewers of the Event at any Permitted Closed-Circuit Location(s) unless the claim or matter arises from the illegal acts of Licensor.

17.    **Entire Agreement/Amendments**.  This Agreement sets forth the entire understanding and agreement of the parties hereto regarding the subject matter hereof, and supersedes all prior agreements, statements, negotiations and understandings (whether written or oral) among the parties hereto regarding such subject matter.  This Agreement may not be altered, amended, or modified except by a subsequent writing signed by the parties hereto and expressly referencing this Agreement.

18.    **Governing Law**.  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN NEW YORK AND SHALL BE GOVERNED, CONSTRUED AND

ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE UNITED STATES OF AMERICA APPLICABLE TO CONTRACTS TO BE FULLY PERFORMED THEREIN. LICENSEE HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE CITY AND COUNTY OF NEW YORK AND TO SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED AT THE ADDRESS FOR SUCH PARTY SET FORTH BELOW AND AGREES NOT TO ASSERT ANY DEFENSE OF FORUM NON-CONVENIENCE OR IMPROPER VENUE IN ANY ACTION BROUGHT IN SUCH COURTS WITH RESPECT TO THIS AGREEMENT OR ANY DISPUTE HEREUNDER.

19. **Subject to Applicable Laws.** Nothing herein contained shall require the commission of any act contrary to an applicable provision of law, or policy of law, or of any rule or regulation of any governmental authority, and if there shall exist any conflict between any provision of this Agreement and any such law, policy, rule or regulation, the law, policy, rule or regulation shall prevail, and the provision or provisions of this Agreement so affected shall be curtailed, limited or eliminated to the extent required to remove such conflict, and the terms and conditions herein as so modified shall continue in full force and effect.

20. **Good Faith.** All parties shall be required to negotiate in good faith any provision in this Agreement requiring mutual agreement of the parties or any term or provision that contemplates the parties having to determine matters necessary to effectuate the purposes of this Agreement after the execution hereof.

21. **Survival.** All provisions of this Agreement (including, without limitation, Paragraphs 8, 9, 11, 12, 13, 18 and 24) which expressly or by necessary implication survive the expiration or earlier termination of the Term shall do so, regardless of the reason for such expiration or termination.

22. **Notices.** All notices or other communications given under this Agreement shall be in writing, shall be sent postage prepaid by registered or certified mail return receipt requested or by hand or message delivery, or by Federal Express or similar nationally recognized overnight delivery service, or by facsimile transmission (confirmed telephonically with the intended recipient), to the other party, at the address below (with a copy to the attention of its Law Department) (unless either party at any time or times designates another address for itself by notifying the other party thereof by certified mail, in which case all notices to such party thereafter shall be given at its most recently so designated address). Notices shall be sent to the following addresses:

If to Licensor:

Showtime Networks Inc.
1633 Broadway

New York, New York 10019
Facsimile No.: 212-708-1450
Attn: Kenneth N. Hershman
With a copy to its Law Department at the same address
(Facsimile: 212-708-1391)

and

Home Box Office, a division of Time Warner Entertainment Company, L.P.
1100 Avenue of the Americas
New York, NY 10036
Facsimile No.: 212-512-8045
Attn: Peter J. Mozarsky, Esq.
With a copy to Mark Taffet at the same address
(Facsimile: 212-512-8080)

If to Licensee:

Garden City Boxing Club
2380 South Bascom Avenue
Suite 200
Campbell, CA 95008
Facsimile No.: (408) 369-8096
Attn: Joseph M. Gagliardi

All notices given by personal delivery shall be deemed received on receipt thereof. Any notice or other communication given by mail shall be deemed received on the earlier to occur of actual receipt thereof or on the fifth (5th) day following mailing thereof. Any notice or other communication given by Federal Express or similar overnight delivery service shall be deemed received on the next business day following delivery of the notice or other communication to such service with instructions for overnight delivery. Any notice or other communication given by facsimile transmission shall be deemed received on the day of transmission if a business day, or on the next business day after the day of transmission if not transmitted on a business day, as long as the person giving the notice has obtained telephonic and electronic confirmation of the receipt thereof by the intended recipient.

23.    **Headings**. Paragraph headings are for the convenience of the reader only and shall be of no effect in construing the contents of the respective paragraphs found in this Agreement. Any ambiguities shall be resolved without reference to which party may have drafted this Agreement.

24.    **NO LIABILITY FOR ACTS OF TYSON, LEWIS, ETC.** RECOGNIZING THE INHERENT UNCERTAINTY REGARDING MIKE TYSON, LENNOX LEWIS, BOXERS GENERALLY, AND BOXING EVENTS FEATURING EITHER MIKE TYSON OR LENNOX LEWIS, LICENSOR

- 15 -

SHALL HAVE NO LIABILITY OR RESPONSIBILITY TO LICENSEE, LICENSEE'S DISTRIBUTION PARTNERS, AND THE PERMITTED CLOSED-CIRCUIT LOCATIONS, AND LICENSEE, ON BEHALF OF ITSELF AND LICENSEE'S DISTRIBUTION PARTNERS AND THE PERMITTED CLOSED-CIRCUIT LOCATIONS; HEREBY RELEASES LICENSOR IN FULL ON ACCOUNT OF, ANY AND ALL OF TYSON'S, LEWIS'S OR ANY OTHER EVENT PARTICIPANT'S ACTIONS OR OMISSIONS IN CONNECTION WITH, DURING OR AFTER THE EVENT OR THEIR MARKETING AND PROMOTION OF THE EVENT, REGARDLESS OF WHETHER SUCH ACTIONS ARE CONTRARY TO ANY LAW, RULE OR REGULATION.

25. **Counterparts; Facsimile Copies**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of such counterparts shall constitute one and the same instrument. Facsimile machine transmitted copies of this Agreement may be executed by the parties and shall be deemed as binding as if originals had been executed.

IN WITNESS WHEREOF, the parties hereto have, through their duly authorized representatives and intending to be legally bound thereby, executed this Agreement as of the date and year first above written, whereupon it becomes effective in accordance with its terms.

HOME BOX OFFICE, a division of Time Warner Entertainment Company, L.P.

By: _____
   Name:
   Title:

SHOWTIME NETWORKS INC.

By: _____
   Name:
   Title:

GARDEN CITY BOXING CLUB, INC.

By: _____
   Name:
   Title:

- 16 -

# EXHIBIT A

## Caribbean Areas Included in the Territory

ANGUILLA (Dog Island, Seal Island, Sombrero Island & Scrub Island)
ANTIGUA and BARBUDA ('a twin-island State of the Caribbean)
ARUBA
BAHAMAS, THE      (comprised of approximately 700 islands, including Grand Bahama Island, Andros, New Providence, Bimini, Eleuthera, Exuma, the Berry Islands, Conception Island, Cat Island, Little Abaco Island and Great Abaco Island)
BARBADOS
BERMUDA
CAYMAN ISLANDS (Grand Cayman, Cayman Brac, and Little Cayman)
CUBA
DOMINICA
DOMINICAN REPUBLIC, THE
GRENADA (Carriacou Island, and Petite Martinique Island)
ST. VINCENT and GRENADINES, THE   (Bequia, Isla a Quatre, Bettowia Island, Baliceaux Island, Mustique, Petit Mustique, Petit Canouan, Canouan, Mayreau, Union Island, Palm Island)
GUADALOUPE (Petite Terre Island, Marie Galante Island)
HAITI
JAMAICA
MARTINIQUE
MONTSERRAT
NETHERLANDS ANTILLES   (which consists of: St. Eustatius, Saba, St. Martin, Curaçao and Bonaire)
ST. BARTS (also known as St. Barthelemy or St. Barth's)
ST. KITTS - NEVIS
ST. LUCIA
TRINIDAD and TOBAGO
TURKS & CAICOS ISLANDS
BRITISH VIRGIN ISLANDS ["British Virgin Islands consist of four larger islands: Tortola, Anegada, Virgin Gorda, and Jost Van Dyke, and 32 smaller islands and islets...." SOURCE: ENCYCLOPEDIA BRITTANICA]

- 17 -

Exhibit B

| | | | | | |
|---|---|---|---|---|---|
| Awash Restaurant | 2218 18th St | NW Washington | DC | 20009 | DTV | JHP |
| Rhino Bar & Pump House | 3295 M St. NW | Washington | DC | 20007 | DTV | JHP |
| Nexis Gold Club | 900 1st St SE | Washington | DC | 20003 | DTV | JHP |
| ESPN Zone @ Washington D.C. | 555 12th St. NW | Washington | DC | 20004 | DTV | JHP |
| Rock, The | 717 6th St. NW | Washington | DC | 20001 | DTV | JHP |

Exhibit C

## AFFIDAVIT

State of: Maryland

County of: Montgomery

I, the undersigned, being duly sworn according to law deposes and says, that on June 8, 2002, I entered the establishment known as Clicks located at 1426 6 Street N.W., Washington D.C. at approximately 11:52 p.m. a.m./(p.m). I paid $ 10.00 to enter this establishment. I ordered No Drinks from a (bartender)/waitress whose name is Brit and who is described as Black Male / Appx 6'1 / No Facial Hair / Bald head. I observed Two televisions sets. They are described as Wall Mounted T.V.'s (See Diagram) and they were located On the Corner, between two walls (See Diagram). On the televisions set(s) I observed the boxing match between Lennox Lewis and Mike Tyson. Mike Tyson was wearing Black trunks and Lennox Lewis was wearing White trunks. I also observed the following: Mike Tyson was knocked down several times throughout the fight / In Round 7 Tyson looks very tired, He's getting hit with everything, Tyson is "KNOCKED OUT" at Round 8 with 48 seconds remaining, The fight is Over!!!. A cable box was/(was not) visible. The channel N/A appeared on the box. This establishment has/(does not) have a satellite dish. There were/(were not) Apartment above or adjacent to the establishment. The establishment is described as an after-hours Sports Pub.

This establishment rates Fair (Good, Fair, Poor). The Capacity of this establishment is approximately 60 people. At the time of my appearance, I counted approximately 13 people on the first head count and 13 on the second count.

Prior to my departure, there were approximately ___13___ people in the establishment. This establishment is located in a **commercial**/**residential** neighborhood. There **was**/**was not** a parking lot connected or adjacent to this establishment. I observed the following license plates either in the parking lot, in front of, or in the immediate vicinity, of this establishment:

I departed this establishment at __12:27__ **a.m.**/**p.m.**

Dated: __June 8, 2002__

Signed: _____

Printed Name: __Rasheed Moss__

Agency: __The Agency__

Address: __8604 Second Ave #143__

City/State: __Silver Spring MD 20910-3326__

Phone #: __301-649-4823__

P.I.#: __101-17939 MD__

## NOTARY

On _____, before me, _____ Notary Republic, personally appeared _____ [ ] personally to me ---or---[ ] proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity and that by his/her signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument. WITNESS my hand and official seal.

_____

Signature of Notary





Exhibit D

SPI, Inc.

4491 Sterling Road
Suite 103
Dania, FL 33314

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/22/2002 | 2002-314 |

| Bill To |
|---------|
| Garden City Boxing Club, Inc.<br>2380 South Bascom Avenue<br>Suite 100<br>Campbell, CA 95008 |

| Description | Amount |
|-------------|--------|
| SIGNAL PIRACY INVESTIGATION<br>June 8, 2002 Tyson/Lewis<br>Clicks<br>Auditor - Rasheed Moss | 350.00 |
| **Total** | $350.00 |